25-1697-cv
*Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*

# United States Court of Appeals for the Second Circuit

August Term 2025
Argued: April 27, 2026
Decided: September 21, 2026
No. 25-1697-cv

ANDOWAH NEWTON,

*Plaintiff-Appellant*,

*v.*

LVMH MOËT HENNESSY LOUIS VUITTON INC.,
RODNEY C. PRATT,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of New York
No. 1:23-cv-10753, Loretta A. Preska, *Judge*.

Before: BIANCO and MENASHI, *Circuit Judges*, and BRINDISI, *District Judge*.*

In 2019, Plaintiff-Appellant Andowah Newton filed a lawsuit in New York state court against her employer, Defendant-Appellee LVMH Moët Hennessy Louis Vuitton Inc. ("LVMH"), alleging that she was sexually harassed and assaulted at work and then was retaliated against for reporting and opposing that conduct. The New York state court eventually compelled that case to arbitration because Newton had signed an arbitration agreement when she started working at LVMH. In 2022, LVMH terminated her employment and about a year later, Newton filed a lawsuit in federal court asserting claims of retaliation in violation of federal, state, and local law against LVMH and her former supervisor, Defendant-Appellee Rodney C. Pratt. She also sought leave to amend her complaint to consolidate her claims that were pending in arbitration with those that she filed in court. In doing so, she argued that the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA") enabled her to invalidate the otherwise-binding arbitration agreement she signed.

As relevant here, the district court dismissed the retaliation claims in her initial complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), because it concluded that Newton had not alleged that she engaged in any protected activity of which Defendants were aware and which was sufficiently close in time to her termination to raise an inference of retaliation. The district court also denied Newton's cross-motion for leave to amend because it concluded that the claims she sought to add remained

* Judge Anthony J. Brindisi, of the United States District Court for the Northern District of New York, sitting by designation.

subject to the arbitration agreement.

We disagree with the district court's first conclusion, but agree with its second one. We conclude that Newton's initial complaint plausibly alleged retaliation in violation of federal, state, and local law. In particular, Newton has plausibly alleged that she engaged in a protected activity when she refused to meet with her supervisor to discuss settling her claims that were pending in arbitration and she was terminated under circumstances raising a plausible inference of retaliation. However, we affirm the district court's denial of Newton's motion for leave to amend her complaint. The claims Newton sought to add had accrued prior to the effective date of the EFAA and did not reaccrue thereafter as part of a continuing violation, rendering the statute inapplicable.

Accordingly, we **AFFIRM** the district court's judgment in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

MAX RODRIGUEZ, Law Office of Max Rodriguez PLLC, New York, New York, *for* Plaintiff-Appellant.

MAAREN A. SHAH, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York (Jan-Philip Kernisan, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C., and Aviva Grumet-Morris, Winston & Strawn LLP, Chicago, Illinois, *on the brief*), *for* Defendants-Appellants.

Roya Vasseghi, Vasseghi Law Group, Fairfax, Virginia, *for Amici Curiae* Artemis Collective, Crime Victims Treatment Center, Just Solutions, Lift Our Voices, National Center on

Sexual Exploitation, National Crime Victim Law Institute, National Organization for Victim Advocacy, National Organization for Women Foundation, Ultraviolet, Victim Rights Law Center, Womankind, and Women Lawyers on Guard, *in support of* Plaintiff-Appellant.

---

JOSEPH F. BIANCO, *Circuit Judge*:

In 2019, Plaintiff-Appellant Andowah Newton filed a lawsuit in New York state court against her employer, Defendant-Appellee LVMH Moët Hennessy Louis Vuitton Inc. ("LVMH"), alleging that she was sexually harassed and assaulted at work and then was retaliated against for reporting and opposing that conduct. The New York state court eventually compelled that case to arbitration because Newton had signed an arbitration agreement when she started working at LVMH. In 2022, LVMH terminated her employment and about a year later, Newton filed a lawsuit in federal court asserting claims of retaliation in violation of federal, state, and local law against LVMH and her former supervisor, Defendant-Appellee Rodney C. Pratt. She also sought leave to amend her complaint to consolidate her claims that were pending in arbitration with those that she filed in court. In doing so, she argued that the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA") enabled her to invalidate the otherwise-binding arbitration agreement she signed.

As relevant here, the district court dismissed the retaliation claims in her initial complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), because it concluded that Newton had not alleged that she engaged in any protected activity of which

Defendants were aware and which was sufficiently close in time to her termination to raise an inference of retaliation. The district court also denied Newton's cross-motion for leave to amend because it concluded that the claims she sought to add remained subject to the arbitration agreement.

We disagree with the district court's first conclusion, but agree with its second one. We conclude that Newton's initial complaint plausibly alleged retaliation in violation of federal, state, and local law. In particular, Newton has plausibly alleged that she engaged in a protected activity when she refused to meet with her supervisor to discuss settling her claims that were pending in arbitration and she was terminated under circumstances raising a plausible inference of retaliation. However, we affirm the district court's denial of Newton's motion for leave to amend her complaint. The claims Newton sought to add had accrued prior to the effective date of the EFAA and did not reaccrue thereafter as part of a continuing violation, rendering the statute inapplicable.

Accordingly, we **AFFIRM** the district court's judgment in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background[1]

Newton is a Black and Afro-Latina attorney who began working for LVMH as litigation counsel in 2015. In that role, she managed legal disputes and active litigation for more than 25 luxury brands that are part of LVMH's portfolio. She was later

[1] The factual summary below is derived from the allegations in the complaint, which we must accept as true in reviewing a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

promoted to Vice President, Legal Affairs, and received various positive performance reviews.

The complaint alleges that shortly after she joined LVMH in 2015, Lloyd Doran, the Director of Property and Facility Operations, began a "persistent and invasive campaign of sexual harassment" against Newton. App'x at 22. The complaint describes the first incident, which occurred in May 2015, as follows. Doran came to Newton's office to discuss making repairs and hanging framed artwork, but before leaving her office, Doran "lingered in the doorway," "stared" at Newton "long enough that she began to feel uncomfortable," and stated: "You are so pretty. And that beautiful smile . . . I just can't get enough of it." *Id.* Newton then "recoiled" and Doran left her office. *Id.* Then every three to four weeks, Doran would "linger" outside of Newton's office and "leer" at her in a sexually suggestive manner. *Id.*

The second incident allegedly occurred in September 2015. According to the complaint, Doran entered Newton's office again to discuss office repairs and artwork hanging while she was seated at her desk in front of her computer. During this discussion, "under the guise of having to call a colleague," Doran "suddenly and without warning lunged his body across and on top of [Newton's], thrusting his pelvis and genitals into her face and pressing his body firmly against hers as he reached across her body for her phone." *Id.* at 23. Newton was thus "pinned against her chair" and left "stunned and terrified." *Id.* She then "frantically" pushed her wheeled chair away from her desk and jumped up from her chair to "mak[e] clear that the contact was unwanted." *Id.* She also "chided" Doran, and he left without saying anything further to Newton. *Id.*

The complaint further alleges that, at some point after these incidents (although the complaint does not specify when),

Newton informally told Frank Martinez, LVMH's Employment Counsel, about Doran's conduct, but that he ignored her comments, quickly changed the subject, and did not ask for any details. Then, at a company event in 2015 or 2016, Doran approached a cocktail table at which Newton was standing with a few other female colleagues. Once Doran arrived, he "made a point of kissing each woman twice—once on each cheek." *Id.* at 24. As he approached Newton, he attempted to kiss her on the cheeks as well, but Newton "leaned her face and body backwards so that he could not reach her." *Id.* In response, Doran "loudly exclaimed": "What? No 'bises' for me?"[2] *Id.* After Newton responded "no," Doran stated: "Oh, come on it's a celebration." Newton then walked away.

According to the complaint, in 2017 and 2018, Doran's alleged "leering" and Newton's informal reporting to Martinez continued. In one incident in fall 2017, Newton and a colleague were speaking in Newton's office when Doran "inexplicably entered" Newton's office and sought to be included in the conversation, but eventually left. *Id.* at 25. Newton's colleague told Newton that Doran's actions were "weird" and "creepy" and also later described Doran as "lurking" and "lingering" around Newton's office. *Id.* In another January 2018 incident, when LVMH's headquarters flooded, Newton rushed to save important files and documents. When she did so, Doran did not offer any help, but instead just leered and "ogled" her. *Id.* at 26.

After another instance of "leering" on May 30, 2018, Newton emailed Martinez and an unnamed real estate lawyer at LVMH to complain about Doran's behavior. When Martinez did not

[2] The complaint explains that "bises" are the pair of kisses that French people who are familiar with each other commonly use to greet each other or say goodbye.

respond, Newton called him, "pleading with him to do something to stop the harassment." *Id.* at 28. In response, Martinez told her that he couldn't report Doran's conduct "because he worked for the legal department, not HR." *Id.* Instead, Martinez suggested that Newton confront Doran directly.

Newton took Martinez's advice, and emailed Doran directly. In the email, she told Doran to stop his "ongoing pattern" of "inappropriate behavior" and "harassment" that included "loitering," "leering," making remarks about Newton's appearance, and invading Newton's personal space—all of which was "unwanted and unwelcome." *Id.* at 28–29. Newton also stated that if Doran's behavior continued, she would formally report him to LVMH's Human Resources Department (the "HR Department"). In addition to sending this email to Doran, Newton then forwarded this email to Martinez and the real estate lawyer. After receiving Newton's email, Martinez called Newton "enraged" and "stated repeatedly in an accusatory tone that he 'now ha[d] to report this.'" *Id.* at 29 (alteration in original).

The next day, LVMH opened an internal investigation into Newton's allegations. The investigation was conducted by LVMH's Senior Director of Talent Development, Emma Ancelle.[3] Ancelle interviewed Newton about her accusations, but Newton says Ancelle's questions were "accusatory" and did not evince any concern about the alleged instances of sexual harassment or assault. Instead, the complaint alleges that Ancelle was "far more concerned about how [Newton's] email could reflect on

---

[3] The complaint also alleges that the internal investigation was supervised and guided by Martinez, Louise Firestone (LVMH's General Counsel), Gena Smith (LVMH's Senior Vice President of Human Resources), and outside counsel Rex Sessions of Winston & Strawn LLP.

[LVMH's] 'branding' and image than she was on the actual sexual harassment that [Newton] had experienced." *Id.* at 32. Ancelle also met with Doran, and after that meeting, she allegedly told Newton that she had concluded that "this was all 'just a misunderstanding' or 'miscommunication,' and that the matter was considered closed." *Id.* Newton also says Ancelle reprimanded her for sending the email to Doran, and suggested that Newton apologize to Doran.

According to the complaint, troubled by LVMH's handling of the internal investigation, Newton filed a formal complaint with the HR Department, and requested an investigation by an "outside, impartial, and unbiased expert." *Id.* at 35. Newton was then summoned to a meeting by LVMH's General Counsel Louise Firestone. In this meeting, Firestone allegedly "chastised" Newton and told her that as professional women, there are "certain things we have to put up with" and "sacrifices we have to make." *Id.* at 36–37.

Nonetheless, Firestone agreed to hire an external investigator to look into Newton's allegations. Part of that investigation involved another interview of Newton. The complaint alleges that, during that interview, the investigator made various insensitive remarks including that people may view Newton as "a troublemaker" and "thin-skinned" and that, because LVMH is a French company, its employees "look at these things differently." *Id.* at 38. Approximately one month after the interview, the HR Department informed Newton that the investigator had not found a violation of company policy or the law.

The complaint further alleges that, after this second investigation, Newton began experiencing a campaign of retaliation. For example, Firestone—as Newton's supervisor—allegedly began to "chip away" at Newton's authority and

autonomy in the office by asserting more control over her cases. *Id.* at 41. In addition, in 2019, Firestone gave Newton a negative oral performance review, despite glowing reviews in prior years. According to the complaint, in 2019 and 2020, LVMH continued to engage in a pattern of retaliatory acts. *See, e.g.*, *id.* at 49–54 (detailing twenty-three alleged instances of retaliation between May 2019 and January 2020, including instances of exclusion, ostracism, and removal of job duties); *id.* at 56–57 (detailing five alleged instances of retaliation between April 2020 and September 2020, including instances of excluding Newton from a "high profile" litigation matter and denying her request to visit a virtual legal conference).

In addition, the complaint alleges that LVMH retaliated against Newton in connection with her requests to work remotely during the COVID-19 pandemic. In September 2020, after months of fully remote work due to the COVID-19 pandemic, LVMH notified employees that they would be required to return to the office two days per week. Newton requested an exception because of certain medical conditions that she believed put her at a higher risk for COVID-19. Thereafter, Newton and LVMH engaged in a series of extended back-and-forth discussions regarding Newton's requests to work remotely, and LVMH's requests for notes from medical providers that documented Newton's need to work remotely. At least one of the notes that Newton provided explained that she needed to work remotely because of her "significant anxiety as a result of a pattern of harassment towards her" and "depression related to her workplace environment." *Id.* at 67. On April 20, 2021, LVMH denied Newton's continued request to work remotely, and in response, Newton went on disability leave for approximately three months. After returning for a few months, in November 2021, Newton requested to work remotely for six months based

on a diagnosis of Post-Traumatic Stress Disorder, but LVMH again requested documentation and further information.

On November 16, 2021, Newton testified before Congress, in front of the House Committee on the Judiciary, about the alleged sexual harassment, assault, and retaliation she experienced at LVMH. The complaint alleges that LVMH's retaliation "intensified" after her congressional testimony through a "long series of delay tactics, extended periods of non-response, dismissiveness, and outrageous actions," including similar allegations of questioning the basis for her medical exemption to LVMH's in-office policy. *Id.* at 73.

On March 3, 2022, President Biden signed the EFAA into law. *See* 9 U.S.C. § 401 *et seq.* Newton was present at the White House for the bill's signing. Three weeks later, on March 25, 2022, LVMH both denied Newton's renewed request to work remotely and refused to consider her for a promotion for which she asserts she was qualified.

From April 2022 to June 2022, the complaint alleges that: (1) Defendants attempted to exclude her from a legal group retreat hosted by LVMH's outside counsel Winston & Strawn, and when she attended anyway, she received "disdainful looks," App'x at 74–75; (2) Defendants did not introduce her to a new department intern; (3) Firestone "repeatedly berated her" for alleged underperformance, *id.* at 76; (4) Firestone gave Newton a time-consuming assignment while Newton was on vacation; and (5) Newton was the only attorney on her team who was not invited to Firestone's farewell dinner in July 2022.

On July 25, 2022, Defendant Rodney Pratt replaced Firestone as Newton's direct supervisor when he joined LVMH as its Chief Legal Officer. The next month, Pratt requested a "'one-on-one' meeting with [Newton] without attorneys present to 'discuss or negotiate a settlement' of her claims against [LVMH]." *Id.* at 76.

She was "[s]cared and appalled" by this request and declined it—although she also alleges in a different paragraph that she "did not respond to his request." *Id.* at 77. According to the complaint, Newton's declination (or non-response) to Pratt's invitation was an assertion of her right to be free from sex discrimination and that after this, Pratt became "infuriat[ed]" and "suddenly and drastically changed the rules" for her and began retaliating against her. *Id.*

In particular, the complaint alleges the following retaliatory acts occurred after Pratt's request to meet: (1) in August 2022, Pratt required Newton to obtain "preapproval before she agreed to speak on any panel or at any conference," *id.*; (2) in September or October 2022, unspecified Defendants "objected to Ms. Newton speaking on a keynote panel" at a conference,[4] *id.*; (3) in October 2022, Pratt "insert[ed] himself in communications on [Newton's] matters while simultaneously excluding her from other very important communications on her matters," *id.* at 78; (4) in late October 2022 and early November 2022, in weekly one-on-one meetings Pratt "generally ignored [Newton] while she spoke, except to sometimes agitatedly criticize her," *id.*; (5) on November 30, 2022, Newton was "excluded" by LVMH from a "farewell dinner" for a departing employee, which was co-hosted by LVMH and an outside law firm, *id.* at 78–79; (6) on the same day, LVMH hosted a sale open to employees, but "went out of its

[4] According to the complaint, Newton spoke at the conference anyway. Specifically, she spoke on a panel titled "Leading by Example: How Women Successfully Passed the Most Bipartisan, Transformational Law Ending the Silencing of Sexual Misconduct Claims" at a "Women, Influence, and Power in the Law" conference. App'x at 77–78. The complaint does not allege that anyone at LVMH was aware that Newton spoke at this conference, or of what Newton said on the panel.

way to exclude and not invite Ms. Newton," *id.* at 79; (7) on December 1, 2022, Newton was fired from her position at LVMH, which was done in a way designed to publicly humiliate her; and (8) after her firing, LVMH was slow to return her personal effects, did not pay her a bonus, a matching charitable contribution, and other ancillary benefits.

The complaint also alleges that Newton engaged in the following additional protected activities after declining Pratt's invitation to meet: (1) she accepted an award from the Crime Victims Treatment Center and, in her acceptance speech, asserted her rights to be free from sex discrimination in her workplace; (2) she spoke on a keynote panel at a conference in which she similarly asserted her rights; and (3) she posted twenty-four posts on various social media platforms about the anniversary of her congressional testimony and the retaliation she experienced at LVMH.

## II. Procedural History

In April 2019, Newton filed a complaint in New York State Supreme Court alleging sexual harassment and retaliation in violation of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"), based on the allegations described above that occurred prior to April 2019. *See* Complaint, *Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*, Index No. 154178/2019 (N.Y. Sup. Ct. Apr. 23, 2019), Dkt. No. 1. LVMH moved to compel arbitration, which the trial court denied, but the First Department subsequently reversed that decision—based on the arbitration agreement LVMH and Newton signed on December 17, 2014, before she began her employment with LVMH—and compelled Newton's case to arbitration. *See Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, 140 N.Y.S.3d 699 (1st Dep't 2021).

On June 1, 2021, pursuant to the First Department's decision, Newton initiated an arbitration proceeding against LVMH, Doran, Firestone, Martinez, LVMH CEO Anish Melwani, and Gena Smith—an HR employee at LVMH—for sexual harassment under the NYSHRL and NYCHRL, retaliation under the NYSHRL and NYCHRL, aider and abettor liability, and violations of the federal Equal Pay Act and the New York Equal Pay Act.

In August 2021, Newton initiated a second arbitration in which she sought a ruling that revisions LVMH had made to its anti-harassment policy abrogated the arbitration agreement she had signed. The second arbitration was consolidated with the first, and the arbitrator decided that Newton's sexual harassment claim was arbitrable and dismissed Newton's second arbitration that challenged the arbitrability of her claims.[5]

On May 19, 2023, Newton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a Notice of Right to Sue on November 24, 2023.

On December 11, 2023, Newton filed the complaint in this action, which asserts the following claims: (1) retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") against LVMH; and (2) retaliation in violation of the NYSHRL and NYCHRL against Pratt. Newton also filed a proposed order to show cause seeking an order enjoining Defendants from continuing the arbitration, and a letter seeking a premotion conference regarding Newton's intended motion for leave to

[5] LVMH also initiated a separate arbitration proceeding against Newton to recover attorney's fees and costs that accrued in connection with LVMH's motion to compel arbitration and the ensuing appeal to the First Department. On March 7, 2024, the arbitrator issued an award granting LVMH almost $500,000 in attorney's fees and costs.

amend the complaint to add her claims that were pending in arbitration. The district court then set a briefing schedule for Defendants to file a motion to compel arbitration and to dismiss, and for Newton to file a cross-motion to enjoin the ongoing arbitration and to amend her complaint.

On August 23, 2024, the district court (1) denied Defendants' motion to compel arbitration,[6] (2) granted Defendants' motion to dismiss under Rule 12(b)(6), and (3) denied Newton's cross-motions to enjoin the arbitration and for leave to amend. *See generally Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, 746 F. Supp. 3d 135 (S.D.N.Y. 2024). The district court entered judgment accordingly in favor of Defendants. Newton then moved, pursuant to Federal Rules of Civil Procedure 59(e) and 60(b)(6), to alter or amend the judgment and sought permission to further replead her claims. On July 2, 2025, the district court denied the reconsideration motion to the extent it sought to vacate the decision to dismiss Newton's claims with prejudice and to deny her cross-motion to amend. *See Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, No. 23-CV-10753 (LAP), 2025 WL 1826583, at *3–4 (S.D.N.Y. July 2, 2025). The district court also denied Newton's request to enjoin the pending arbitration.[7] *Id*. at *6.

Newton timely appealed from the judgment and the district court's order denying relief under Fed. R. Civ. P. 59(e) and 60(b).[8]

---

6 This holding is not at issue on appeal because Defendants have not appealed it.

7 The district court granted Newton's request—made pursuant to Rule 52(b)—to vacate its prior finding that her cross-motion to amend was made in bad faith. *See Newton*, 2025 WL 1826583, at *5. That ruling is not at issue in this appeal.

8 On March 31, 2026, after briefing and oral argument before this Court was complete, the arbitrator issued a post-hearing award in favor of LVMH

## DISCUSSION

On appeal, Newton argues that the district court erred by dismissing her retaliation claims pursuant to Rule 12(b)(6), denying her cross-motion for leave to amend, denying her cross-motion to enjoin the then-ongoing arbitration, and denying her motion to alter or amend the judgment to permit repleading. We address her arguments regarding the dismissal of her retaliation claims first.

### I. Newton's Retaliation Claims

We review the district court's dismissal of the retaliation claims in Newton's initial complaint *de novo*, accepting as true all factual allegations and drawing all reasonable inferences in favor of the plaintiff. *Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023). To survive dismissal, the pleadings must contain "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *i.e.*, the pleaded facts must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*,

---

and other defendants that are not parties to this case on all of Newton's claims. Thus, Newton's argument that the district court erred by denying her cross-motion to enjoin the arbitration is moot now that the arbitration has ended. *See PolyOne Corp. v. Westlake Vinyls, Inc.*, 937 F.3d 692, 702 (6th Cir. 2019). The arbitration award has also been confirmed by a New York state trial court. *See* Appellees' Aug. 5, 2026, R. 28(j) Ltr. (attaching the state court judgment confirming the award). Thus, in a Rule 28(j) letter, Defendants suggest that the award has preclusive effect on the claims Newton sought to add to this lawsuit, and factual issues relevant to those claims. *Id.* at 1–2. However, because we conclude in any event that the district court did not err in denying Newton's motion for leave to amend, we need not decide what preclusive effect, if any, the arbitration award would have with respect to the claims in the proposed amended complaint.

556 U.S. 662, 678 (2009) (internal citation omitted).

### A. The Applicable Law of Retaliation

Title VII makes it unlawful to retaliate against an employee "because [s]he has opposed any practice made an unlawful practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Thus, this antiretaliation provision contains an "opposition clause" and a "participation clause." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 275 (2009); *accord Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012). Only the former kind of protected activity is relevant here.[9]

To survive a motion to dismiss, a plaintiff asserting a Title VII retaliation claim under the opposition clause must plausibly allege that "(1) defendants discriminated—or took an adverse employment action—against [her], (2) because [she] has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (internal quotation marks and citation omitted). "[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks and citation omitted).

The NYSHRL and NYCHRL contain similar prohibitions on unlawful retaliation. *See* N.Y. Exec. Law § 296(7); N.Y. City Admin. Code § 8-107(7). To succeed on a NYSHRL or NYCHRL retaliation claim, a plaintiff "must demonstrate that she took an

---

[9] The "participation clause" is triggered only once a plaintiff files a charge with the EEOC. *See Townsend*, 679 F.3d at 49. Here, Newton did not do so until May 19, 2023, well after the alleged retaliation at issue in this case.

action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024).[10]

Before proceeding to consider how these principles apply to Newton's claims, we briefly discuss timeliness as it relates to the scope of Newton's claims. Title VII claims that accrue more than 300 days before a plaintiff files a charge with the EEOC are time-barred.[11] *See* 42 U.S.C. § 2000e-5(e)(1); *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010). Newton filed her EEOC charge on May 19, 2023. Therefore, consideration of her Title VII claim is limited to violations that accrued after July 23, 2022. Similarly, Newton's NYSHRL and NYCHRL claims are limited to events occurring after July 25, 2022. Although retaliation claims under the NYSHRL and NYCHRL are subject to a three-year statute of limitations, *see Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (citing N.Y. Exec. Law § 296; N.Y. C.P.L.R. § 214; N.Y.C. Admin. Code § 8-502(d)), those claims are brought against only Pratt individually, he did not join LVMH until that date, and he cannot be held liable for alleged retaliation in which he was not personally involved. *See Feingold v. New York*, 366 F.3d 138, 157–59 (2d Cir. 2004) (explaining

---

10 Newton does not argue that there is any material difference between the Title VII, NYSHRL, and NYCHRL legal standards articulated above as applied to this case.

11 A claim "accrues" "when the plaintiff has a complete and present cause of action." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810 (2024) (internal quotation marks and citation omitted). In other words, "the time a claim 'accrues' means the point at which the statute of limitations clock starts ticking." *Olivieri v. Stifel, Nicolaus & Co.*, 112 F.4th 74, 87 (2d Cir. 2024).

that, under both the NYSHRL and NYCHRL, individual defendants must have "actually participate[d]" in the conduct giving rise to the claims). Moreover, because the complaint does not allege any relevant conduct that occurred between July 23rd and 25th, 2022, we begin our analysis by looking at the complaint's allegations after July 25th. With that scope defined, we now consider whether the complaint plausibly alleges that Newton engaged in protected activity and that such activity caused one or more adverse employment actions.

### B. Protected Activity

An employee engages in "opposition" to unlawful employment practices (and thus engages in protected activity) when she engages in "any activity designed to resist or antagonize; to contend against; to confront; resist; or withstand discrimination." *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (citation modified); *see also Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (explaining that protected activity under the NYSHRL is "action taken to protest or oppose statutorily prohibited discrimination") (internal quotation marks and citation omitted); *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 46 (2d Cir. 2025) (analyzing protected activity under Title VII, the NYSHRL, and the NYCHRL in tandem). This can include "making complaints to management" or "protesting against discrimination by industry or by society in general." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Thus, "when an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication *virtually always* constitutes the employee's opposition to the activity." *Crawford*, 555 U.S. at 276 (emphasis added) (citation modified). Finally, in the Title VII context, to constitute protected activity, the employer must have

"understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). We have applied that same standard to NYSHRL and NYCHRL claims. *See, e.g.*, *Qorrolli*, 124 F.4th at 122–23; *accord Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 & n.10 (2d Cir. 2011) (applying this requirement to a NYSHRL claim); *Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x 26, 28 (2d Cir. 2013) (summary order) (same, to a NYCHRL claim).

Here, the complaint alleges that Newton engaged in two categories of protected activity after July 2022. In August 2022, she refused to meet with Pratt to discuss settlement and, in three instances in October and November 2022, she spoke out in a public forum or on social media to assert her right (and all women's rights) to be free from sex discrimination in the workplace. As to the first category, the district court concluded that refusing to meet with Pratt did not constitute a protected activity. *Newton*, 746 F. Supp. 3d at 157. With respect to the second, the district court concluded that Newton did not plausibly allege that Defendants were aware of Newton's statements. *Id.* at 157–58.

We disagree with the district court's first conclusion. Under these factual circumstances, Newton has plausibly alleged that her refusal to meet with Pratt to discuss a potential settlement of her then-pending claims against LVMH (and others) was a protected activity.

As an initial matter, filing a lawsuit, an EEOC charge, or arbitration demand that alleges violations of Title VII, the NYSHRL, or the NYCHRL unquestionably constitutes a protected activity. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2000); *Vega*, 801 F.3d at 92. This is because, at its core, filing a claim against an employer making such accusations is an

assertion by the plaintiff that he or she believes that they have been wronged in a way that violates the antidiscrimination statutes. The document that initiates a civil action is called a *complaint*, after all. *See* Fed. R. Civ. P. 3.

If initiating a claim constitutes an assertion that the plaintiff was wronged, refusing to *end* a pursuit of that same claim with a settlement can—depending on the context—constitute a continuation of the same assertion. The relevant question is whether the employer understood or could reasonably have understood that the plaintiff's refusal was an assertion of her continued opposition to the employer's unlawful employment practices in violation of Title VII. *Galdieri-Ambrosini*, 136 F.3d at 292. If so, the refusal is a protected activity. *Crawford*, 555 U.S. at 271.

Under Defendants' interpretation of Title VII, Pratt could have explicitly stated to Newton that he was terminating her because she refused to meet with him to settle the case and she would still have no retaliation claim based on his conduct because her refusal did not constitute protected activity. That interpretation not only defies the plain meaning of "oppose" in the text of Title VII, but also contradicts our above-referenced precedent which makes clear that "opposition," for purposes of a retaliation claim, includes "any activity designed to resist or antagonize; to contend against; to confront; resist; or withstand discrimination." *Littlejohn*, 795 F.3d at 317 (citation modified). Thus, such opposition can potentially include not only the filing of a discrimination lawsuit itself, but also other statements made, activities pursued, or positions taken by a plaintiff during the course of that discrimination lawsuit—such as a deposition, settlement discussions, a trial, or an appeal. *See, e.g.*, *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) (holding that plaintiff's Title VII appeal to D.C. Court of Appeals six years after

the original protected activity of filing a discrimination complaint with an administrative agency was itself a protected activity). Context is key in making this determination because it informs what the employer could have reasonably understood. *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (emphasizing that "[c]ontext matters" in determining whether an act of retaliation is materially adverse).

Here, based on the allegations regarding the context of Newton's refusal to meet with Pratt, we conclude that the complaint plausibly alleges that Defendants understood or could reasonably have understood that her refusal constituted continued opposition to Defendants' alleged unlawful employment practices. By August 2022, when Newton refused to meet with Pratt, she had been vigorously, continuously, and publicly asserting that Defendants had engaged in unlawful employment practices for more than three years. For example, she filed a complaint in New York state court, opposed a motion to compel arbitration, and filed an arbitration demand when her opposition was ultimately unsuccessful. Moreover, outside of the formal legal proceedings, she spoke out publicly, including before a congressional committee, asserting that she had been harassed and assaulted by Doran and retaliated against by LVMH and various of its employees. In this context and at this stage in the litigation, in which we must draw "all inferences . . . in the plaintiff's favor," *Littlejohn*, 795 F.3d at 306–07, Newton has plausibly alleged that when she refused to meet with Pratt to discuss settlement, he could have reasonably understood that refusal as communicating her continued belief that she had been wronged by Doran and LVMH's discriminatory conduct, and that she wanted acknowledgement and legal redress for those wrongs. That constitutes opposition and, thus, protected activity.

*See Crawford*, 555 U.S. at 277.[12]

Defendants' arguments to the contrary are unpersuasive. Their primary argument is that Newton's refusal to meet with Pratt was not a protected activity because she "does not allege she told Pratt she was doing so in order to continue objecting to alleged misconduct." Appellees' Br. at 32. To be sure, at this stage of the litigation, the precise way that Newton communicated her refusal is unclear. On one hand, the complaint alleges that Newton "refused" Pratt's request to meet. App'x at 77. On the other, the complaint asserts that, "[a]fter she *did not respond* to [Pratt's] request," he began to retaliate against her.[13] *Id.*

---

[12] To be clear, our holding should not be read to establish a *per se* rule that refusing to settle a pending claim always constitutes a form of opposition to unlawful employment practices. What an employer can reasonably understand such a refusal to communicate depends on the full context of the refusal. Nor should our holding necessarily preclude a different finding in later stages of this lawsuit. The fact that Newton has plausibly alleged a protected activity based on her refusal to engage in settlement discussions in her discrimination lawsuit at the motion to dismiss stage does not necessarily mean that the district court at summary judgment or a factfinder at trial would reach that determination under the applicable standard based on the evidence available at that time. In other words, Newton has met her minimal pleading burden, but we express no view as to whether she will be able to sustain her evidentiary burden at later stages of the case. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–11 (2002) (distinguishing between pleading burdens and evidentiary standards such as the familiar *McDonnell Douglas* framework); *see also Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208–09 (2d Cir. 2020) (discussing the continued effect of *Swierkiewicz* post-*Iqbal*).

[13] Defendants state in their brief that the invitation to meet and Newton's declination were both sent through counsel. *See* Appellees' Br. at 33. However, Defendants do not cite anything in the complaint for this factual assertion and, at the motion to dismiss stage, we are "limited" to "the allegations in the complaint." *Nunes v. CNN, Inc.*, 31 F.4th 135, 142

(emphasis added). Thus, based on the allegations in the complaint, Newton's declination did not contain an explicit statement opposing unlawful employment practices and may not have been an affirmative statement at all.

However, these ambiguities do not render Newton's refusal to meet an unprotected activity. The mere fact that Newton may not have specifically stated to Pratt that her refusal to meet was to continue objecting to unlawful employment practices is not dispositive because such an explicit statement is not required. Instead, the Supreme Court has recognized that conduct or communications that reveal opposition, even implicitly, can constitute protected activity. *See Crawford*, 555 U.S. at 277 ("Countless people were known to 'oppose' slavery before Emancipation, or are said to 'oppose' capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons."); *accord Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011) (concluding that opposition under the NYCHRL does not require an explicit statement that the plaintiff is a victim of discrimination). Therefore, so long as such implicit conduct or communications put an employer on notice that the plaintiff is opposing conduct prohibited by the antidiscrimination statutes, it can suffice as protected activity. *Galdieri-Ambrosini*, 136 F.3d at 292. In short, drawing all inferences in Newton's favor, that notice has been plausibly alleged even if she merely failed to answer Pratt's request to meet

(2d Cir. 2022).

with him regarding settlement of her discrimination lawsuit. In other words, Pratt could have reasonably concluded that her unwillingness to respond to that request was another expression of her opposition to the employer's discriminatory conduct.

Next, the cases that Defendants rely on—and which the district court relied on, *see Newton*, 746 F. Supp. 3d at 157—are not binding on us and, in any event, are distinguishable. For instance, Defendants rely on *Bottge v. Suburban Propane*, 77 F. Supp. 2d 310 (N.D.N.Y. 1999). There, the plaintiff was fired just before she would obtain a substantial increase in her employer's contribution to her retirement benefits. *Id.* at 312. Then, when she refused to sign a waiver of all discrimination claims, her severance pay was withheld. *Id.* After these events, the plaintiff filed a charge of discrimination with the EEOC. *Id.* The district court concluded there was no protected activity present at the time of the plaintiff's termination and the withholding of severance pay because there was no "indicia in declining to sign a waiver suggesting that the employee has made a complaint." *Id.* at 313. In other words, because the EEOC charge was the first indication that the plaintiff attributed her firing to unlawful employment practices, her employer was "not on notice that her refusal to sign the waiver was related to a complaint of discrimination." *Id.* Similarly, in *Pleener v. New York City Board of Education*, the plaintiff refused to sign a release of claims before she filed an EEOC charge or a lawsuit. No. 05 CV 973 (ARR), 2007 WL 2907343, at *16 (E.D.N.Y. Oct. 4, 2007). Because there was thus "no evidence . . . suggesting that [the defendants] w[ere] aware, based on plaintiff's refusal to sign, that she intended to sue them," the district court concluded that there was no protected activity. *Id.* In sum, in both cases, the employers could not have reasonably interpreted the plaintiffs' actions as opposing unlawful employment practices because the plaintiffs had not yet

alleged (formally or otherwise) that they experienced harassment or discrimination.

Here, by contrast, when Newton declined to meet with Pratt, Defendants were undoubtedly aware that Newton believed that she experienced discrimination at LVMH, including harassment and an assault. She had been speaking out against the alleged mistreatment and vigorously litigating to seek compensation for years. Thus, the context and timeline of Newton's refusal to discuss settlement explains why a reasonable employer could have understood her refusal differently than the employers in *Bottge* and *Pleener*.

Finally, Defendants resort to policy arguments to support their position. In particular, they contend that, if refusing to discuss settlement can constitute a protected activity, "parties would have significant disincentives to initiate settlement discussions, undermining the strong public policy favoring settlement, and even court ordered settlement communications could lead to retaliation claims." Appellees' Br. at 33. As a threshold matter, "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022). In any event, it is difficult to imagine how this holding will have a chilling effect on settlement negotiations. It will hardly come as a surprise to employers, who are already well aware that retaliation against an employee for filing a discrimination lawsuit violates Title VII, that they also cannot retaliate against that same employee for refusing to settle the case. Moreover, it would make no sense, in light of the text and purpose of Title VII, to provide an employee with protection from retaliation from the initial filing of a discrimination lawsuit, but then leave them unprotected if the employer for whatever reason did not retaliate upon such filing, but rather chose to retaliate (including by termination of employment) because of subsequent

statements made or positions taken by the employee in connection with settlement discussions or other aspects of the ongoing litigation.

In sum, based upon the facts alleged in this complaint, we conclude that Newton has plausibly alleged that her refusal to meet with Pratt to discuss a potential settlement of her then-pending discrimination claims constituted protected activity under Title VII, the NYSHRL, and the NYCHRL.[14]

### C. Causation

Having determined that Newton has plausibly alleged a protected activity, we now proceed to consider whether she has plausibly alleged causation between her protected activity and her termination on December 1, 2022.[15]

To state a Title VII, NYSHRL, or NYCHRL retaliation claim, the plaintiff must plausibly allege a causal connection between the protected activity and the adverse employment action. *Vega*, 801 F.3d at 90 (Title VII); *Harrington v. City of New York*, 70 N.Y.S.3d 177, 180 (1st Dep't 2018) (NYSHRL and NYCHRL). Under Title VII the plaintiff must ultimately show "but-for" causation. *Univ. of*

---

14 Because we conclude that Newton has alleged a protected activity in connection with her refusal to meet with Pratt to discuss settlement of her claims in August 2022, and has plausibly alleged a retaliation claim based on that protected activity for reasons discussed *infra*, we need not address whether the district court also erred in determining that her statements at a public forum and on social media in October and November 2022 did not constitute protected activity because she did not sufficiently allege the employer's awareness of such activity.

15 Defendants do not contest that Newton's termination constitutes an adverse employment action. *See* Appellees' Br. at 29; *see also Edelman*, 141 F.4th at 45–46 (concluding that termination is an adverse employment action under Title VII, the NYSHRL, and the NYCHRL).

*Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Under the NYSHRL and NYCHRL, however, the plaintiff need only show "that retaliatory animus was a motivating factor, that is, that it played any role at all in the challenged conduct." *Edelman*, 141 F.4th at 49 (internal quotation marks and citations omitted). Moreover, under any of these statutes, one available method of plausibly alleging causation is to do so "indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90; *accord Harrington*, 70 N.Y.S.3d at 181. "We have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish [the requisite] causal relationship." *Littlejohn*, 795 F.3d at 319 (internal quotation marks and citation omitted). Instead, "our caselaw teaches that a period of several weeks to several months may establish the required causal relationship." *Ziparo v. CSX Transp., Inc.*, 160 F.4th 314, 336 (2d Cir. 2025).

Here, Newton's refusal to meet with Pratt occurred on an unspecified date in August 2022, and she was informed of her termination on December 1, 2022. App'x at 76. Thus, the time between the refusal and the termination is as much as four months. We have previously held that similar amounts of time are sufficient to suggest causation. *See, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[W]e have previously held that five months is not too long to find the causal relationship."); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (five months); *Gorman-Bakos v. Cornell Co-Op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) (four months).

Importantly, "[w]here temporal proximity is not the only evidence that bears on a causal connection, we have recognized that the lapse in time between the protected activity and adverse action can be longer." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277–

78 (2d Cir. 2023). That additional evidence of causation can arise in the context of an ongoing discrimination lawsuit brought by the employee. *See, e.g.*, *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446–47 (2d Cir. 1999) (noting that adverse actions within one month of receipt of plaintiff's deposition notices may be retaliation for initiation of lawsuit approximately one year earlier where harassment was ongoing throughout litigation), *abrogated on other grounds by Burlington N.*, 548 U.S. 53; *Mosleh v. Howard Univ.*, No. 19-CV-00339 (CJN), 2020 WL 956527, at *8 (D.D.C. Feb. 27, 2020) (noting that "retaliatory conduct that occurred during the course of litigation, long after the *original* protected activity, may sufficiently indicate a temporal causation link") (internal quotation marks and citation omitted). Moreover, in looking at "the facts as a whole," we can also consider intervening patterns of "antagonism" or a "drumbeat of retaliatory animus" that do not themselves necessarily rise to a level of an adverse employment action. *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018). Such additional facts inform our "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *see also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

Here, Newton does not rely solely on temporal proximity to plead causation. Instead, Newton has also alleged that she experienced repeated instances of antagonism and retaliatory animus between refusing to meet with Pratt and her termination. For example, she alleges she was required to seek preapproval from Defendants before she agreed to speak on any outside

panels; that Defendants objected to her speaking on an outside keynote panel; that Pratt unnecessarily inserted himself into some of Newton's matters while also excluding her from others; that Pratt ignored Newton in weekly one-on-one meetings except to criticize her; that she was excluded from a farewell dinner for a departing employee in the legal department; and that she was not invited to a sale hosted by LVMH that was otherwise open to LVMH employees.

Moreover, Newton alleges that the manner of her termination by Pratt was a departure from company protocol and done to humiliate her:

> On or about November 28, 2022, for the first time ever, Defendant Pratt scheduled a mandatory in-person team meeting for the entire Legal Department on Thursday, December 1, 2022. . . . On or about November 30, 2022, Defendant Pratt rescheduled his regular one-on-one meeting with Ms. Newton to December 1, 2022. . . . When Ms. Newton arrived at the meeting, she noted that Defendant Louis Vuitton's Human Resources Director Jolie Shehadeh was also present. At the December 1, 2022 meeting, Defendant Pratt informed Ms. Newton that her employment would be terminated effective January 1, 2023. Ms. Newton was instructed to exit the office "within the hour," by 5 PM, and to leave her work devices and badge in the office. At the discharge meeting, Defendant Pratt explicitly stated that Ms. Newton's firing was completely unrelated to her performance. Upon information and belief, Defendant Louis Vuitton's protocol was to terminate previous executives on Fridays at 8 AM, specifically so that no one else would see or hear, and to avoid their humiliation in front of their colleagues. Defendant Louis Vuitton decided to use a different practice when firing Ms. Newton as Defendant Louis Vuitton intended to—and did—humiliate her by making her firing as public as

> possible. In fact, to make sure that Ms. Newton was as publicly demeaned and dehumanized as possible, and so that other employees could be reminded of what happens to employees who report sexual harassment and retaliation, Defendant Pratt scheduled the unprecedented, highly unusual, mandatory, in-person team meeting for 4 PM that very Thursday, immediately after the meeting in which he fired Ms. Newton, with the express intent of making sure that all of her colleagues were present to watch her public humiliation. Defendant Louis Vuitton's intended effect took place—when the team meeting finished, her colleagues returned from the meeting just in time to see her frantically packing up her personal items, sweating profusely, while the HR and building staff assigned to monitor her packing barked their countdown at her: "7 minutes! . . . 2 minutes! . . . 30 seconds!"

App'x at 79–80.

Assuming the truth of these allegations and drawing all inferences in Newton's favor (as we must at the motion to dismiss stage), the combination of temporal proximity and these antagonistic actions lead us to conclude that Newton has plausibly alleged causation. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) ("[T]he combination of reasonably close temporal proximity and the particular context in this case is sufficient to infer causation.").

* * *

In sum, we conclude that Newton's complaint plausibly alleged a claim of retaliation under Title VII, the NYSHRL, and the NYCHRL.

## II. Newton's Motion to Amend

At the same time that Newton opposed Defendants' motion to dismiss before the district court, she also filed a cross-motion to

amend her complaint, which the district court denied. *Newton*, 746 F. Supp. 3d at 160–62. For the reasons explained in more detail below, we conclude that Newton's attempt to amend her complaint was futile because the claims she sought to add were covered by a binding arbitration agreement.

Federal Rule of Civil Procedure Rule 15(a)(2) provides that "[a] court should freely give leave" to amend "when justice so requires." Leave may be denied, however, "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (internal quotation marks and citation omitted). Although "we ordinarily review a district court's denial of leave to amend for abuse of discretion," *Yerkyn v. Yakovlevich*, 164 F.4th 224, 227 (2d Cir. 2026), when "the denial was based on an interpretation of law, such as futility," "[t]he denial of leave to amend is . . . reviewed *de novo*," *Gelbiom v. Bank of Am. Corp.*, 823 F.3d 759, 769 (2d Cir. 2016) (internal quotation marks and citation omitted). It is futile to seek to amend to add claims that are subject to a binding arbitration agreement. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (explaining that, where proposed allegations would not lead to a "different result," amendment would be futile).

Newton's cross-motion to amend sought to "consolidate" her claims that were then pending in arbitration, and the retaliation claims that were pending in this lawsuit. Appellant's Br. at 20. Thus, in the proposed amended complaint (the "PAC"),[16]

---

[16] The version of the PAC in the Appendix is the version submitted by Newton in connection with a premotion letter. *See* App'x at 131–219. The version submitted with Newton's actual cross-motion to amend differs slightly in that it contains some additional allegations. *See* Proposed Amended Complaint, *Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*,

Newton sought to add five new Defendants: (1) Doran (the alleged harasser); (2) Firestone (LVMH's former general counsel); (3) Martinez (employment counsel at LVMH); (4) Melwani (LVMH's CEO); and (5) Smith (Senior Vice President of HR at LVMH). It also sought to add four new claims: (1) sexual harassment, a hostile work environment, and retaliation in violation of the NYSHRL and NYCHRL against all Defendants; (2) aider and abettor liability for the same conduct under the NYSHRL and NYCHRL against all individual Defendants; (3) a violation of the federal Equal Pay Act, 29 U.S.C. § 206(d), against all Defendants; and (4) a violation of the New York Equal Pay Act, N.Y. Labor Law § 190 *et seq.*, against all defendants.[17]

The parties do not dispute that the new claims in the PAC are (at least facially) subject to an arbitration agreement that Newton signed when she joined LVMH. We generally must enforce such agreements. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Newton argues, however, that the EFAA allows her to invalidate her arbitration agreement and bring all of her claims in court.

---

No. 23-CV-10753 (S.D.N.Y. Mar. 19, 2024), Dkt. No. 37. In evaluating Newton's appeal, this Court analyzes the version actually submitted with Newton's cross-motion and refers to it as the "PAC." *See* Fed. R. App. P. 10(a)(1) (defining the record on appeal as, in relevant part, "the original papers and exhibits filed in the district court"); Fed. R. App. P. 30(a)(2) ("Parts of the record may be relied on by the court or the parties even though not included in the appendix.").

[17] The PAC also contained the same two Title VII, NYSHRL, and NYCHRL retaliation claims contained in Newton's initial complaint. The only difference is that, although the NYSHHRL/NYCHRL claim was previously brought only against Pratt, the PAC sought to bring it against all defendants.

The EFAA provides that:

> [A]t the election of [a] person alleging conduct constituting a sexual harassment dispute or sexual assault dispute . . . no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C § 402(a). However, the EFAA applies only "with respect to any dispute or claim that arises or accrues on or after" March 3, 2022. Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022).[18] A claim "accrues" at "the point at which the statute of limitations clock starts ticking." *Olivieri*, 112 F.4th at 87. That point "depends on the nature of the claim, and is informed by common law principles." *Id.*

For the reasons explained below, we conclude each of the new claims that Newton sought to add in the PAC accrued prior to March 3, 2022.

### A. Hostile Work Environment Claims

We first consider those claims alleging a retaliatory hostile work environment in violation of the NYSHRL and NYCHRL. *See Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 179 (2d Cir. 2023) (discussing the standard for a "retaliatory hostile work environment claim"). Fundamentally, those claims are based on Doran's alleged "unwanted sexual advances" and "unwanted verbal and physical conduct of a sexual nature" directed towards Newton, and LVMH and its employees' allegedly deficient and

[18] "It makes no legal difference that this provision is codified in a statutory note, not the main body, of the United States Code." *Olivieri*, 112 F.4th at 84 n.4.

retaliatory responses. PAC ¶¶ 353–54. These claims (and the factual allegations underpinning them) are nearly identical to those contained in the arbitration demand that Newton filed on June 1, 2021. *Compare* App'x at 248–310 (Newton's 2021 arbitration demand) *with* PAC ¶¶ 1–258, 326–77. Thus, each of those claims accrued by June 1, 2021—before the effective date of the EFAA, which renders it inapplicable.

In an attempt to avoid this conclusion, Newton argues that the continuing violation doctrine applies, which would mean that her claims reaccrued after the EFAA became effective. Thus, Newton contends that the district court "erred by denying [her] request for leave to amend the [c]omplaint to add her claims from the Sexual Misconduct Arbitration to this case because they were part of a retaliatory hostile workplace subject to the continuing violation doctrine that extended through [her] termination." Appellant's Br. at 25. We are unpersuaded.

The continuing violation doctrine is a different way of determining when a claim accrues. It applies to unlawful employment practices that "cannot be said to occur on any particular day," because they "are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). For example, a hostile work environment claim is generally subject to the continuing violation doctrine. *Id.*; *see also Olivieri*, 112 F.4th at 91 (NYSHRL); *St. Jean Jeudy v. City of New York*, 37 N.Y.S.3d 498, 500 (1st Dep't 2016) (NYCHRL).

However, to trigger the doctrine, the timely and untimely acts must be "sufficiently related" such that they constitute part of the same "unlawful employment practice." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75, 77 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Lozada v. Hook*, 54 N.Y.S.3d 688, 689 (2d Dep't 2017) (explaining that, under the NYSHRL, timely and untimely instances must be "specific and related");

*Taylor v. City of New York*, 207 F. Supp. 3d 293, 302–03 (S.D.N.Y. 2016) (same for the NYCHRL).[19] To determine whether the requisite relationship between timely and untimely acts has been shown, we consider a variety of factors, including "the commonality of the environment in which the incidents took place (and whether a change in environment is due to intervening action by the employer), the nature of the incidents, and the temporal discontinuity between the incidents."[20] *McGullam*, 609 F.3d at 80–81 (Calabresi, *J.*, concurring). At bottom, this is a flexible inquiry necessitated by the "context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." *Id.* at 77 (majority op.).

We have held that "[a] discrete discriminatory act, such as termination, within the limitations period may not only support a claim for damages, it may also render a hostile work environment claim timely *if it is shown to be part of the course of discriminatory conduct that underlies the hostile work environment*

---

19 Newton does not argue that there is any difference between the relevant requirements articulated in *McGullam* (a Title VII case), and the requirements applicable to NYSHRL and NYCHRL claims. *See* Appellant's Br. at 31–32.

20 Other circuits look to similar factors. *See, e.g.*, *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016) (applying a non-exhaustive and flexible analysis that looks to, *inter alia*, the "type, frequency, and perpetrator" of the harassment); *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 740 (5th Cir. 2017), as revised (Mar. 13, 2017) (looking to whether "the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers") (quoting *Morgan*, 536 U.S. at 120–21); *Shiba v. Mullin*, 174 F.4th 1025, 1034–35 (7th Cir. 2026) (similar); *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539–40 (8th Cir. 2014); (similar); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) (similar); *Baird v. Gotbaum*, 792 F.3d 166, 168–69 (D.C. Cir. 2015) (similar).

*claim*." *King v. Aramark Servs. Inc.*, 96 F.4th 546, 561 (2d Cir. 2024) (emphasis in original). In doing so, we emphasized that "[a]n unrelated discrete act, different in kind from the conduct giving rise to the hostile environment, does not trigger the continuing violation doctrine." *Id*.

When the continuing violation doctrine is applicable, it means that the claims in question "do not accrue . . . until the last discriminatory act in furtherance of the hostile work environment." *Olivieri*, 112 F.4th at 88 (internal quotation marks and citation omitted). In other words, when the continuing violation doctrine applies to certain claims, they "accrue, and reaccrue, each time a defendant commits an act that is part of the same course of harassing conduct." *Id.* We applied the continuing violation doctrine in the context of the EFAA in *Olivieri* and confirmed that the EFAA is triggered if a hostile work environment claim reaccrues pursuant to the continuing violation doctrine after the effective date of the EFAA. *Id.* at 91–92.

We conclude that the continuing violation doctrine is inapplicable here. Indeed, Newton effectively admitted as much before the district court. In response to Defendants' motions to dismiss or compel arbitration Newton herself described the relationship between her pre- and post-EFAA allegations as follows:

> [T]he claims currently before [the arbitrator] are different from those here; the former include sexual harassment, assault, and pay inequity, whereas the claims here do not; and *the retaliation claims here are materially different because the pending retaliation claims in arbitration are comprised primarily of retaliatory hostile work environment while the retaliation claims in the instant proceeding arise primarily out of Defendants' retaliatory discharge of Ms. Newton from her employment, denial of reasonable*

*accommodation, and denial of promotion*.

Plaintiff's Memorandum of Law at 18–19, *Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*, No. 23-CV-10753 (S.D.N.Y. Mar. 19, 2024), Dkt. No. 37 (emphasis added). To be sure, this statement in Newton's brief was in response to Defendants' argument that the EFAA was inapplicable because Newton had elected to arbitrate her claims, and overall, she still argued that the continuing violation doctrine applied to her claims. We thus do not consider Newton to have waived or forfeited application of the continuing violation doctrine.

However, we agree with Newton's statement regarding the material difference in her retaliation claims for purposes of the continuing violation doctrine because the pre- and post-EFAA allegations of retaliation are not sufficiently related such that they are "part of the [same] course of discriminatory conduct." *King*, 96 F.4th at 561 (emphasis omitted). We reach this decision primarily because as alleged in the PAC, the "who," and the "how" of the alleged harassment and retaliation differed between the two relevant time periods. *See Montanus v. Columbia Mgmt. Inv. Advisers, LLC*, No. 25-CV-2798 (PAE), 2025 WL 2503326, at *6 (S.D.N.Y. Sept. 2, 2025) ("Since *Olivieri*, courts in this Circuit have emphasized that the continuing violation doctrine does not permit a litigant to pursue claims based on conduct predating the EFAA by citing later dissimilar acts.") (collecting cases).

With respect to the "who," Newton's pre-EFAA allegations center around Doran and Firestone. The core harassment that Newton alleges is Doran's alleged sexual harassment of Newton from 2015 to 2020[21] and the one alleged instance of sexual assault

[21] Although it is not entirely clear from the PAC when Doran's alleged harassment ended, it alleges that Doran announced his retirement in

in 2015. Moreover, the primary perpetrator of the alleged pre-EFAA retaliation was Firestone—LVMH's General Counsel and Newton's boss.[22] In contrast, the post-EFAA retaliation that Newton alleges was perpetrated almost entirely by Pratt. By the time of the EFAA's effective date on March 3, 2022, Doran had already retired from LVMH, and Firestone retired shortly thereafter on July 25, 2022. Accordingly, that the alleged perpetrators of the relevant unlawful employment practices differed pre- and post-EFAA supports our conclusion that the two periods do not constitute a continuing violation. *See Purcell v. N.Y. Inst. of Tech. - Coll. of Osteopathic Med.*, 931 F.3d 59, 65 (2d Cir. 2019) ("The lack of overlap between alleged harassers . . . points against finding a continuing violation.").

Next, we consider the "how"—*i.e.*, the type and characteristics of the alleged unlawful employment practices. They also differed pre- and post-EFAA. Most obviously, all of Doran's alleged acts of sexual harassment and assault occurred well before the effective date of the EFAA—and did not reoccur post-EFAA. In addition, based on the allegations in the complaint, the character of the alleged retaliation changed too. Pre-EFAA, the alleged retaliation was carried out by, *inter alia*, conducting "sham" investigations that found no wrongdoing, PAC ¶¶ 96–139; giving Newton a series of negative performance reviews, *id.* ¶¶ 147–50, 184–85, 219; refusing to involve Newton in the interviewing and hiring of interns, *id.* ¶¶ 152–53, 170; prominently celebrating Doran, *id.* ¶¶ 156–57; denying the allegations in Newton's

October 2020. PAC ¶ 200.

22 Newton also alleges various retaliatory actions committed by Martinez, Melwani, and Smith, *see, e.g.*, PAC ¶¶ 90–95, 132–35, 156, 162, 170, 244, but she does not allege any post-EFAA actions by these individuals.

original state court complaint, *id.* ¶¶ 158–64; unnecessarily monitoring whether Newton was working on remote workdays, *id.* ¶ 170; putting up unreasonable obstacles to granting Newton's requests to work remotely, *id.* ¶¶ 188–99, 216–19, 225–29, 233–58, 263–65, 269, 277; and delaying disbursement of matching donations to the charity Newton founded in memory of her brother, *id.* ¶¶ 203–11.

Post-EFAA, the nature of the alleged unlawful employment practices was different. Gone are any allegations of sexual harassment or assault. As to retaliation, the alleged post-EFAA conduct, as noted *supra*, is based primarily upon her termination which we conclude is "[a]n unrelated discrete act, different in kind from the [pre-EFAA] conduct giving rise to the [retaliatory] hostile environment" alleged in the PAC. *King*, 96 F.4th at 561. Moreover, the other more minor post-EFAA instances of alleged retaliation—such as requiring Newton to obtain pre-approval before speaking on an outside panel or at an outside conference and objecting to one such request, *id.* ¶ 296–97; simultaneously micromanaging certain of Newton's matters, and excluding her from others, *id.* ¶ 301; ignoring her in meetings, *id.* ¶ 302; and not inviting her to a farewell dinner and a sale for LVMH employees, *id.* ¶¶ 304–05—are generally different in kind from the pre-EFAA allegations of retaliation. In short, this substantial lack of overlap in the type and character of the alleged unlawful employment practices pre- and post-EFAA further supports our conclusion that there was no continuing violation. *See McGullam*, 609 F.3d at 78.

To summarize, we hold that the proposed new retaliatory hostile work environment claims in the PAC accrued prior to the EFAA and did not reaccrue after the EFAA pursuant to the continuing violation doctrine, and thus it would have been futile to allow Newton to amend to add these claims.

### B. Unequal Pay Claims

We similarly conclude that Newton's proposed unequal pay claims under the Federal Equal Pay Act and its New York analog accrued before the EFAA's effective date.[23] Claims under these statutes accrue with each paycheck reflecting an unlawful pay disparity. *See Nakahata v. N.Y.–Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 198 (2d Cir. 2013) (explaining that causes of action under the FLSA and NYLL "accrue[] on the next regular payday following the work period when services are rendered"); *see also Kellogg v. Ball State Univ.*, 984 F.3d 525, 530–31 (7th Cir. 2021) (discussing this "paycheck accrual rule"). However, the continuing violation doctrine does not apply to Newton's equal pay claims because "a claim of discriminatory pay is fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action." *Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 119 (2d Cir. 1997).

As an initial matter, Newton has forfeited any challenge to the district court's conclusion that her equal pay claims accrued before the EFAA because she neglected to make that argument in her brief. *See* Appellant's Br. at 28–41. However, even assuming *arguendo* that Newton had raised that argument, the PAC does not contain any allegations regarding Newton's post-EFAA pay, let alone post-EFAA allegations that would plausibly support a claim under either the Federal or New York equal pay acts. Instead, Newton's equal pay allegations are limited to the period from 2015 to 2020. *See* PAC ¶¶ 47–55. Accordingly, Newton's

---

[23] These claims are analyzed according to similar standards with minor differences not relevant here. *See Edelman*, 141 F.4th at 41–42 & n.4.

equal pay claims accrued well before the EFAA's effective date, they are subject to the arbitration agreement, and her effort to add them in the PAC was thus futile.

### C. The Meaning of "Case" & "Dispute" in the EFAA

Newton also argues in the alternative that, even if the claims she sought to add in the PAC accrued before the effective date of the EFAA, the EFAA operates to invalidate her predispute arbitration agreement as to her entire case, regardless of when each of its constituent claims accrued. According to Newton, because (1) the EFAA invalidates an arbitration agreement as to an entire "case" and (2) the PAC is part of the "case," the EFAA invalidates the arbitration as to the claims in the PAC.

Assuming *arguendo* that Newton's first contention is correct,[24] her argument fails at the second step. The claims in the PAC are not part of a "case" in court for the simple reason that a proposed amended complaint is not operative until a motion for leave to amend is granted. *See* 6 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1484 (3d ed. 2025) ("[I]f an amendment that cannot be made as of right is served without obtaining the court's leave or the opposing party's consent, it is without legal effect."); *Murray v. Archambo*, 132 F.3d 609, 612 (10th

---

[24] Whether the EFAA can operate to invalidate a predispute arbitration agreement as to an entire lawsuit or only as to sexual harassment or assault causes of action within that lawsuit is the subject of an appeal pending before a different panel of this Court. *See Diaz-Roa v. Hermes Law, P.C. et al.*, No. 24-3223-cv. We express no opinion on this question. That our disposition of this case results in some of Newton's claims proceeding in court and others proceeding in (a now-concluded) arbitration is a result of the EFAA's non-retroactivity provision and the unusual procedural posture of this case, not our interpretation of "case" in the substantive provisions of the EFAA.

Cir. 1998) (noting that "an amendment that has been filed or served without leave of court or consent of the defendants is without legal effect"). Indeed, under the local rules governing proceedings before the district court in this case, a proposed amended complaint is not automatically rendered operative even when a district court grants a motion to amend under Rule 15. Instead, a new pleading must be separately filed within seven days of the order granting the Rule 15 motion. *See* S.D.N.Y. & E.D.N.Y. Local Civ. R. 15.1(b) (2024) (available at https://perma.cc/PM2R-7W2S). Thus, the new claims in the PAC were never part of the "case" Newton filed in court.

Next, Newton argues that, even if her claims accrued pre-EFAA, the statute applies to "any *dispute* . . . that arises or accrues on or after" the EFAA's effective date. Pub. L. No. 117–90 § 3 (emphasis added). According to Newton, because she filed this lawsuit on December 11, 2023, the *dispute* arose after the EFAA's effective date, and it is thus applicable. *Id.* Several of our sister circuits have interpreted "dispute" in the EFAA context. *See Famuyide v. Chipotle Mexican Grill, Inc.*, 111 F.4th 895, 898 (8th Cir. 2024) (explaining that a dispute under the EFAA arises when an employee "assert[s] any right, claim, or demand against" the employer and the employer "registered disagreement" with the employee's position); *Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 409 (6th Cir. 2025) (holding that a dispute under the EFAA arises "when the parties became adverse to one another"); *Cornelius v. CVS Pharmacy Inc.*, 133 F.4th 240, 247–48 (3d Cir. 2025) (same).

However, we need not delve into this question of statutory interpretation to reject Newton's argument. Instead, we assume without deciding that there is a difference "between the date on which a dispute arises and the date on which a claim accrues when interpreting the effective date provision." *Memmer*, 135

F.4th at 418 (Thapar, *J.*, dissenting) (disagreeing with such an interpretation). Moreover, we assume the interpretation of the term "dispute" under the EFAA that is most favorable to Newton, namely, "when the parties became adverse to one another." *Id.* at 409 (majority op.). Here, even under that interpretation, the "dispute" between Newton and LVMH arose at least by the time Newton filed her initial discrimination lawsuit in state court in April 2019, well before the effective date of the EFAA, and not when Newton subsequently filed her federal lawsuit with additional claims in 2023.

Accordingly, the meaning of "case" and "dispute" in the EFAA do not change our conclusion that the new claims in the PAC do not trigger the EFAA and remain subject to the binding arbitration agreement. We thus decline Newton's request to "confirm retroactivity in this case," Appellant's Br. at 51, contrary to Congress's command.[25]

---

[25] To be clear, our conclusion that it was futile for Newton to add the new claims in the PAC does not necessarily preclude her "from using the prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113; *see also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."); *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) ("[E]vidence of earlier promotion denials [falling outside of the limitations period] may constitute relevant 'background evidence in support of a timely claim,' and we will consider it as such.") (quoting *Morgan*, 536 U.S. at 113). Thus, we express no view as to whether any of the pre-EFAA allegations can be used as background to support her claim for a retaliatory termination.

## CONCLUSION

To summarize, although we conclude that the district court erred in dismissing Newton's retaliation claims contained in her initial complaint, we conclude that the district court did not err in denying Newton's cross-motion to amend to consolidate the claims in the initial complaint with the claims that were (at the time) pending in arbitration.[26] We thus **AFFIRM** the district court's judgment in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

[26] To the extent that Newton argues that the district court erred by denying her subsequent motion to alter or amend the judgment on the same grounds, we find those same arguments similarly unpersuasive, for the reasons set forth *supra*.